# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| GARY GEDIG,<br>Derivatively on Behalf of KiOR, Inc.,<br><br>    Plaintiff,<br><br>v.<br><br>FRED CANNON, JOHN KARNES, SAMIR<br>KAUL, DAVID PATERSON, WILLIAM<br>ROACH, and GARY WHITLOCK,<br><br>    Defendants,<br><br>-and-<br><br>KiOR, INC., a Delaware Corporation,<br><br>    Nominal Defendant. | Civil Action No. _____ |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

JURISDICTION AND VENUE ............................................................................ 7

PARTIES ............................................................................................................. 7

DUTIES OF THE DEFENDANTS ..................................................................... 11

FACTUAL ALLEGATIONS ............................................................................... 15

    I.     The Company .......................................................................................... 15

    II.    KiOR's Future Depended on Creating an Impression that Its Biomass Technology Could Achieve Commercially Viable Production Levels at the Company's Columbus Facility............................................................................................................. 16

    III.   Throughout the Relevant Period, the Columbus Facility Was Plagued by Massive Technological Difficulties that Prevented It from Operating Most of the Time and Seriously Limited Output Even When the Plant Was Operational ................................ 18

    IV.   During the Relevant Period, Cannon and Karnes, with the Blessing of the Other Defendants, Repeatedly Misled Investors Concerning Operations at the Columbus Facility............................................................................................................. 20

        A.    Misleading Statements During the Fourth Quarter of 2012 ....................................... 20

        B.    Misleading Statements During the First Quarter of 2013........................................... 22

        C.    Misleading Statements During the Second Quarter of 2013 ....................................... 23

        D.    The Truth Is Revealed .......................................................................... 25

DAMAGES ALLEGATIONS................................................................................ 26

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ................................. 27

FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS............................. 30

SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS.......................... 30

REQUEST FOR RELIEF ..................................................................................... 31

JURY DEMAND.................................................................................................. 31

Plaintiff Gary Gedig ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant KiOR, Inc. ("KiOR" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon Plaintiff's personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of KiOR Board meeting minutes, Board materials, and internal business records obtained from KiOR pursuant to 8 Del. C. §220, as well as a review of publicly available information, including filings by KiOR with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## INTRODUCTION

███████████████████████████████

**- Board of Directors Funding Review Presentation, August 8, 2012**

1.    This is a shareholder derivative action arising from Defendants' breaches of their fiduciary duties of loyalty and good faith, brought on behalf of KiOR against its Chief Executive Officer and Director Fred Cannon ("Cannon"), recently resigned Chief Financial Officer John Karnes ("Karnes")[1], Director Samir Kaul ("Kaul"), Director David Paterson ("Paterson"), Director Dr. William Roach ("Roach"), and Director Gary Whitlock ("Whitlock") (collectively, "Defendants").

2.    Cannon and Karnes are liable to the Company for breach of fiduciary duty because, in violation of their fiduciary duty and the federal securities laws, they misled investors concerning the progress at KiOR's first and only commercial-scale biofuel facility, which is located in Columbus, Mississippi (this facility is referred to herein as the "Columbus facility").

---

[1] Karnes' resignation as CFO was announced on December 4, 2013.

1

At the same time as they were making misleading statements that artificially inflated the price of KiOR stock, Cannon and Karnes were engaging in insider sales of KiOR stock that allowed them to benefit from the misleading impression they created. Kaul, Paterson, Roach, and Whitlock are liable to the Company for breach of fiduciary duty because, as Directors of KiOR, they were regularly briefed on the massive problems at the Columbus facility and therefore knew that the statements made by Cannon and Karnes were false and misleading. However, in violation of their fiduciary duty, Kaul, Paterson, Roach, and Whitlock allowed Cannon and Karnes to continue making false statements about the Columbus facility in violation of the federal securities laws and to the detriment of KiOR.

3.     KiOR is a renewable fuels startup company whose only business is the development and commercialization of a novel process for converting non-food biomass into cellulosic gasoline and diesel fuel. KiOR's proprietary technology implements a two-step process for converting non-food biomass (or plant material) into gasoline and diesel fuel. The first step is referred to as "Biomass Fluid Catalytic Cracking" or thermal catalytic process (hereinafter referred to as "BFCC"). The BFCC "deoxygenates the biomass...producing a renewable intermediate hydrocarbon-based oil."[2] The second step utilizes hydro-processing technology to convert this crude oil into gasoline and diesel blend stocks.

4.     KiOR's success as a company and the value of Defendants' shareholdings of KiOR rested entirely on proving that KiOR's biomass technology was commercially viable by achieving commercial-scale fuel production at the Columbus facility. Completed in May 2012 and, touted as having a production capacity of "13 million gallons of cellulosic diesel and gasoline per year,"[3] the Columbus facility was the crucible for KiOR's technology. If large scale

---

[2] Q3 2011 Earnings Call, dated Nov. 10, 2011, at 2.
[3] SEC Form 10-Q, for period ended June 30, 2012, at 12.

production could be achieved there, then KiOR would be able to access the capital markets to obtain additional funding for the expansion of the Columbus facility and the construction of a new plant in Natchez, Mississippi.  If large scale production could not be achieved, then KiOR's ability to raise additional capital in the market would be doubtful, jeopardizing KiOR's ability to continue as a going concern.

5.     Indeed, Defendants repeatedly acknowledged amongst themselves that maintaining a perception of progress at the Columbus facility was critical to KiOR's ability to raise capital and KiOR's very survival.



6.     If Defendants were not able to create an impression of progress at the Columbus facility and secure additional funds, KiOR faced collapse.  As the Company revealed in its SEC Form 10-Q for 2Q 2013: "The Company must raise capital in one or more external equity and/or debt financings by the end of September 2013 to fund the cash requirements of its ongoing

---

[4] Citations to bates numbers refer to the 262 pages of Board minutes, materials, and other documents obtained by Plaintiff from KiOR pursuant to 8 Del Corporation Law §220 (hereinafter "§220"), which allows a shareholder to conduct a books and records examination to investigate potential wrongdoing at the Company.

operations. . . The lack of any committed sources of financing other than the remaining availability under the Loan and Security Agreement raises substantial doubt about the Company's ability to continue as a going concern.  The Company's failure to timely obtain additional financing could require it to suspend some or all of its operations."

    7.    During the Relevant Period (August 14, 2012 to August 7, 2013),



The Columbus facility's dismal performance and ongoing problems were closely monitored by Cannon and regularly reported to the other Defendants at Board meetings so that all Defendants were acutely aware of these problems.

    8.    Cannon and Karnes, with the blessing of the co-Defendants, concealed the extent of the production difficulties at the Columbus facility by making factually unsupportable assurances that KiOR had addressed the issues and was on track to imminently produce millions of gallons of fuel.

---

[5] The term "run" refers to the operation of the Columbus facility.

9.      For example, on KiOR's March 18, 2013 earnings call, Cannon falsely proclaimed that "we have overcome" the "normal start-up issues" at the Columbus facility and "have proven that KiOR's proprietary biomass-to-fuels technology works at commercial scale at Columbus." Cannon went on to assure investors that, with the Columbus facility on track, fuel productions would be in the range of "approximately 3 million to 5 million gallons for the balance of the year."



10.     Similarly, on KiOR's first quarter 2013 conference call on May 9, 2013, Cannon assured investors: "Consistent with our previous guidance, we expect that total fuel production during the second quarter will range between 300,000 gallons and 500,000 gallons, keeping us on track to fall within our projected production range of 3 million gallon[s] to 5 million gallons for 2013." Defendants knew this statement lacked any reasonable basis. KiOR's second quarter comprised the months of April, May, and June.

[REDACTED]

11.     Defendants leveraged the overly rosy impression of the Columbus facility productions in their efforts to raise additional funds from investors. [REDACTED]

[REDACTED] Meanwhile, Cannon and Karnes also benefited from their false statements by selling $580,000+ worth of KiOR stock during the Relevant Period at prices inflated by their false statements.

12.     By August 8, 2013, Defendants could no longer hide the truth about the Columbus facility. The Company disclosed that it had only shipped 75,000 gallons of biofuel during the second quarter of 2013 – far below the 300,000-500,000 gallons that Cannon promised to investors three months earlier.  On this revelation, KiOR's stock declined $2.14 per share, or 44%, over the course of the next six trading sessions, from a close of $4.76 per share on August 7, 2013 to a close of $2.62 per share on August 15, 2013.

13.     Defendants' breach of their fiduciary duties caused KiOR substantial harm. Defendants have damaged KiOR's credibility with investors and thereby harmed the Company's ability to raise money for expansion.  The Company is the subject of a securities class action pending before this Court, *Berry v. Kior, Inc.*, No. 13-cv-2443 (S.D. Tex.), that will cause the Company to incur significant defense costs and put the Company at risk of an adverse judgment

of hundreds of millions of dollars.   Further, the Company is entitled to recoup the $580,000+ in insider trading profits unlawfully obtained by Cannon and Karnes as a result of their fraud.

14.   Accordingly, Plaintiff brings this action to assert KiOR's claims against Defendants to recoup the losses arising from their breaches of fiduciary duties of loyalty and good faith, and to require the Company to reform its corporate governance practices to prevent the continued mismanagement of the Company in an illegal fashion.

**JURISDICTION AND VENUE**

15.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2).   Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.   This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

16.   The Court has personal jurisdiction over each Defendant because each Defendant has committed acts within this District, which are related to the claims at issue in this Complaint.

17.   Venue is proper in this District because Nominal Defendant KiOR is headquartered in this District.   Additionally, venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

**PARTIES**

**Plaintiff**

18.   Plaintiff Gary Gedig is a shareholder of KiOR and has continuously held his shares since October 2012. Plaintiff is a citizen of Whitefish Bay, Wisconsin.

**Nominal Defendant**

19.   Nominal Defendant KiOR is a corporation incorporated under the laws of

7

Delaware with its principal place of business in Pasadena, Texas. The Company's stock is traded on NASDAQ under ticker symbol "KiOR."

**The Individual Defendants**

20.    As of the date of this Complaint, KiOR has a seven-member Board, five of whom are Defendants in this action: Cannon, Kaul, Paterson, Roach, and Whitlock. In addition, KiOR's recently resigned CFO, Karnes, is a Defendant.

21.    Defendant Fred Cannon joined KiOR in June 2008 as a Director, President, and Chief Operating Officer. Cannon was elected Chief Executive Officer in July 2010. The Board minutes and materials obtained by Plaintiff pursuant to Section 220 show that during the Relevant Period, as described below, Cannon had intimate knowledge of the problems at the Columbus facility, and was responsible for reporting those problems to KiOR's Board of Directors, yet made false and misleading statements to shareholders in violation of the federal securities laws. As indicated in KiOR's most recent proxy, dated April 17, 2013, Cannon did not qualify as an "independent" director under the guidelines set forth by either NASDAQ or the Company itself. Cannon received approximately $4.5 million in compensation from the Company in 2012. On September 4, 2012, Cannon sold 8,944 shares of KiOR at a price of $7.36, for proceeds of $65,827.84. On March 4, 2013, Cannon sold 9,402 shares of KiOR at a price of $5.45, for proceeds of $51,334.92. On March 12, 2013, Cannon sold 22,894 shares of KiOR at a price of $5.80, for proceeds of $132,785.20. On May 7, 2013, Cannon sold 37,082 shares of KiOR at a price of $4.88, for proceeds of $180,960.16. Upon information and belief, Cannon is a citizen of Houston, Texas.

22.    Defendant John H. Karnes was KiOR's Chief Financial Officer from February 2011 until December 3, 2013. In that position, Karnes exercised control over the corporate

statements of KiOR complained of herein. Karnes received approximately $2 million in compensation from the Company in 2012.  The Board minutes and materials obtained by Plaintiff pursuant to Section 220 show that during the Relevant Period, as described below, Karnes had intimate knowledge of the problems at the Columbus facility based on, *inter alia,* his regular attendance at Board meetings where these problems were discussed, yet made false and misleading statements to shareholders in violation of the federal securities laws.  Further, Karnes had intimate knowledge of KiOR's financing needs and was responsible for briefing the Board on KiOR's efforts to court additional investors.  On September 4, 2012, Karnes sold 1,789 shares of KiOR at a price of $7.36, for proceeds of $13,167.04.  On March 4, 2013, Karnes sold 2,083 shares of KiOR at a price of $5.50, for proceeds of $11,456.50.  On March 12, 2013, Karnes sold 10,103 shares of KiOR at a price of $5.76, for proceeds of $58,193.28.  On May 7, 2013, Karnes sold 13,517 shares of KiOR at a price of $4.88, for proceeds of $65,962.96.  Upon information and belief, Karnes is a citizen of Houston, Texas.

23.      Defendant Samir Kaul has served as a Director of KiOR since November 2007. Kaul is a founding partner of Khosla Ventures.[6]  Khosla Ventures is a venture capital firm that founded KiOR in 2007 and is KiOR's largest shareholder, holding approximately 81% of the voting power of KiOR. By 2010, Khosla Ventures had already invested $111 million in KiOR.[7] As of July 26, 2013, Khosla Ventures held 59,997,044 shares of KiOR, which accounted for

---

[6] The term "Khosla Ventures" refers to Khosla Ventures and any of its predecessors, successors, affiliates, subsidiaries, or parents and any of its directors, officers, employees, directors, partners, or owners.
[7] According to Global Data's September 2013 Analyst Report, Khosla Ventures provided over $111.14 million by IPO, with an undisclosed firm providing $40 million.  Jeff St. John, *Trouble for KiOR's Biowaste-to-Biocrude Business,* GREENTECH MEDIA, Aug. 16, 2013, http://www.greentechmedia.com/articles/read/trouble-for-KiORs-biowaste-to-biocrude-business.

58.2% of Class A Common Stock. [8] This amount of stock had a market value of approximately $411.6 million at the beginning of the Relevant Period, when the share price was $6.86. Kaul's role on the Board of Directors is to monitor Khosla Venture's substantial interest in KiOR, which directly benefited from the false statements made by Cannon and Karnes. As indicated in KiOR's most recent proxy, dated April 17, 2013, Kaul did not qualify as an "independent" director under the guidelines set forth by either NASDAQ or the Company itself. The Board minutes and materials obtained by Plaintiff pursuant to Section 220 show that during the Relevant Period, as described below, Kaul had intimate knowledge of the problems at the Columbus facility based on, *inter alia,* his regular attendance at Board meetings where these problems were discussed, yet allowed Cannon and Karnes to make false and misleading statements to shareholders in violation of the federal securities laws. Kaul is also Chair of the Nominating and Governance Committee and Chair of the Compensation Committee of KiOR's Board. Upon information and belief, Kaul is a citizen of California.

24.    Defendant David J. Paterson has served as a Director of KiOR since June 2012. The Board minutes and materials obtained by Plaintiff pursuant to Section 220 show that during the Relevant Period, as described below, Paterson had intimate knowledge of the problems at the Columbus facility based on, *inter alia,* his regular attendance at Board meetings where these problems were discussed, yet allowed Cannon and Karnes to make false and misleading statements to shareholders in violation of the federal securities laws. Because Khosla Ventures holds a majority of KiOR stock, Paterson serves at the discretion of Khosla Ventures. Paterson is currently a member of the Compensation Committee. Upon information and belief, Paterson is

---

[8] Khosla Ventures' August 2, 2013 Form SC 13D/A filing states: "Vinod Khosla beneficially owned 59,997,044 shares of Class A common stock, representing a beneficial ownership of approximately 58.2% of the shares of Class A common stock. Of the shares of Class A common stock beneficially owned by Mr. Khosla, 46,259,738 shares are comprised of Class B common stock beneficially owned by him, all of which are convertible into Class A common stock at any time on a one-for-one basis at the option of the holder of such shares."

a citizen of Atlanta, Georgia.

25.      Defendant Dr. William Roach has served as a Director of KiOR since July 2010. The Board minutes and materials obtained by Plaintiff pursuant to Section 220 show that during the Relevant Period, as described below, Roach had intimate knowledge of the problems at the Columbus facility based on, *inter alia,* his regular attendance at Board meetings where these problems were discussed, yet allowed Cannon and Karnes to make false and misleading statements to shareholders in violation of the federal securities laws.  Because Khosla Ventures holds a majority of KiOR stock, Roach serves at the discretion of Khosla Ventures.  Roach is currently a member of the Audit Committee and the Nominating and Governance Committee. Upon information and belief, Roach is a citizen of Alberta, Canada.

26.      Defendant Gary Whitlock has served as a Director of KiOR since December 2010. The Board minutes and materials obtained by Plaintiff pursuant to Section 220 show that during the Relevant Period, as described below, Whitlock had intimate knowledge of the problems at the Columbus facility based on, *inter alia,* his regular attendance at Board meetings where these problems were discussed, yet allowed Cannon and Karnes to make false and misleading statements to shareholders in violation of the federal securities laws.  Because Khosla Ventures holds a majority of KiOR stock, Whitlock serves at the discretion of Khosla Ventures. Whitlock is currently the chair of the Audit Committee and a member of the Compensation Committee. Upon information and belief, Whitlock is a citizen of Spring, Texas.

## DUTIES OF THE DEFENDANTS

27.      By reason of their positions as officers and/or directors of KiOR, and because of their ability to control the business and corporate affairs of KiOR, the Defendants owed KiOR and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations

11

required the Defendants to use their utmost abilities to control and manage KiOR in an honest and lawful manner. The Defendants were and are required to act in furtherance of the best interests of KiOR and its investors. Each director of the Company owes to KiOR and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

28.     Because of their positions of control and authority as directors and/or officers of KiOR, Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive, managerial, and directorial positions with KiOR, each of the Defendants have access to adverse, non-public information about the financial condition, operations, and improper representations of Cannon and Karnes.

29.     In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects.

30.     A Board cannot knowingly cause or allow a corporation to act illegally. As the Delaware Chancery Court stated, "Delaware corporate law has long been clear on this rather obvious notion; namely that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully." *Desimone v. Barrows,* 924 A.2d 908, 934-35 (Del. Ch. 2007). Reflecting this bedrock principal of Delaware law, the Company's Board Committee charters, as well as its Code of Business Conduct and Corporate Governance Guidelines, require KiOR's Board of Directors to ensure that the Company does not violate laws and regulations.

31.     By virtue of these duties, Defendants were required, among other things, to:

        a.   Endeavor in good faith to ensure the Company's compliance with its legal obligations and requirements;

b. Remain informed as to how KiOR conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices;

c. Endeavor in good faith to ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations; and

d. Endeavor in good faith to ensure that all Board decisions were the product of independent business judgment and not the result of outside influences or entrenched motives.

32.     The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of KiOR, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Defendants were aware posed a risk of serious injury to the Company.

33.     In carrying out their unlawful schemes, Defendants committed clear breaches of their fiduciary duties to the Company.  As members of KiOR's Board of Directors, Defendants were charged with overseeing the Company's business practices and policies, and were required to review "periodic financial statements, earnings reports, press releases, analyst reports and other information designed to keep them informed of the material aspects of the Company's business, performance and prospects."[9]

34.     In addition to the duties described above, the Director Defendants had additional duties as members of certain subcommittees of KiOR's Board of Directors.

**Duties of the Nominating and Corporate Governance Committee Members**

35.     The Nominating and Corporate Governance Committee is required to "[p]rovide oversight of corporate governance matters."[10] This includes the duty to oversee the Company's

---

[9] KiOR's Corporate Governance Guidelines, http://investor.kior.com/documentdisplay.cfm?DocumentID=9003 (last visited Dec. 5, 2013).
[10] KiOR's Nominating and Corporate Governance Committee Charter,
http://investor.kior.com/documentdisplay.cfm?DocumentID=9006 (last visited Dec. 5, 2013).

adherence to applicable corporate governance principles and policies and oversee the evaluation of the Board and management. In conjunction with these duties, the Nominating and Governance Committee has the authority to conduct any investigation it deems necessary or appropriate in fulfilling its responsibilities. Kaul is the chair of this committee, and Roach is a member.

**Duties of the Audit Committee Members**

36. KiOR's Audit Committee is required to, among other things, monitor the Company's compliance with legal and regulatory requirements and monitor "the integrity of the Company's financial statements."[11] The Audit Committee is further charged with discussing significant risk areas and the steps management has taken to monitor and control such exposures and report them to the Board. In conjunction with these duties, the Audit Committee has the authority to conduct any investigation appropriate to fulfill these responsibilities. Whitlock is the chair of this committee, and Roach is a member. As members of the Audit Committee, Whitlock and Roach were required to approve the Company's 10-K and 10-Q SEC filings as well as all earnings press releases. In addition, Audit Committee members were required to report to the Board.

**Duties of the Compensation Committee**

37. According to its charter, KiOR's Compensation Committee is responsible for assisting the Board in fulfilling its oversight responsibilities in connection with executive compensation matters. In addition, in determining the CEO's "Total Compensation," the Compensation Committee must consider factors including the Company's performance and

---

[11] KiOR's Audit Committee Charter, http://investor.kior.com/documentdisplay.cfm?DocumentID=9004 (last visited Dec. 5, 2013).

relative shareholder return.[12] The Compensation Committee has the authority to conduct any investigation appropriate to fulfilling its responsibilities. Kaul is the chair of this committee, and Paterson and Whitlock are members.

## FACTUAL ALLEGATIONS

### I.   The Company

38.   KiOR is a renewable fuels startup that has developed a "never before attempted" process for converting non-food biomass into cellulosic gasoline and diesel fuel. "Through this vision, biomass-derived fuel could be produced in seconds, versus the millions of years it takes to produce fossil fuels in nature."[13] KiOR's proprietary technology implements a two-step process for converting non-food biomass (or plant material) into gasoline and diesel fuel. The first step is referred to as "Biomass Fluid Catalytic Cracking" or thermal catalytic process ("BFCC"). The BFCC "deoxygenates the biomass…producing a renewable intermediate hydrocarbon-based oil." The second step utilizes hydro-processing technology to convert this crude oil into gasoline and diesel blend stocks.[14] KiOR's proprietary technology is designed to create fuel-blend stocks that are "virtually indistinguishable" from fossil fuels.[15] Because KiOR's proprietary process converts biomass into gasoline and diesel blend stocks, the Company is eligible to participate in the markets created by the federal government's "Renewable Fuel Standard Program" ("RFS2").[16] In order to participate, KiOR must receive regulatory approval for its proprietary fuel pathway, including both the technical and commercial feasibility of the process.

---

[12] KiOR's Compensation Committee Charter, http://investor.kior.com/documentdisplay.cfm?DocumentID=9005 (last visited Dec. 5, 2013).
[13] KiOr About Us, http://www.KiOR.com/content/?s=2&t=About-Us (last visited Dec. 5, 2013).
[14] Q3 2011 Earnings Call, dated Nov. 10, 2011, at 2.
[15] *Id.*
[16] *Id.*

39.     KiOR is primarily owned by Khosla Ventures, a venture capital firm that founded KiOR in 2007 and retains 81% of KiOR's voting power.  Khosla Ventures has made significant financial investments in KiOR since its inception.  By 2010, Khosla Ventures had invested $111 million in KiOR's proprietary technology.[17]  Through  2013, as KiOR continued to struggle in its efforts to raise money from outside investors, Khosla Ventures issued an additional $50 million.[18]  At the same time, KiOR's management negotiated the terms of a two-tranche facility for $150 million of funding from Khosla Ventures, AIMCo, and Gates Ventures. [KIOR_Gedig_000142].

**II.     KiOR's Future Depended on Creating an Impression that Its Biomass Technology Could Achieve Commercially Viable Production Levels at the Company's Columbus Facility**

40.     KiOR's future as a company turned on its ability to convince investors that it was succeeding at generating commercially viable levels of fuel at the Columbus facility, the Company's first, and to date its only commercial scale facility, using the Company's unproven biomass technology.

41.     Throughout the Relevant Period, Defendants were repeatedly informed that the success of the Columbus facility was highly material to KiOR investors and central to KiOR's success as a company. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[17] *See supra* fn. 7.
[18] [KiOR_Gedig_000125]; *see also* SEC Form 8-K, dated Aug. 27, 2013, at 2.





**III. Throughout the Relevant Period, the Columbus Facility Was Plagued by Massive Technological Difficulties that Prevented It from Operating Most of the Time and Seriously Limited Output Even When the Plant Was Operational**

46.     The Columbus facility went live in September 2012 and from the outset, it was

clear to Defendants that the Columbus facility



18





51.      The Columbus facility continued its poor performance through the remainder of the Relevant Period with the Company reporting publicly that only 75,000 gallons of fuel had been shipped in the second quarter of 2013.

**IV.    During the Relevant Period, Cannon and Karnes, with the Blessing of the Other Defendants, Repeatedly Misled Investors Concerning Operations at the Columbus Facility**

52.      Faced with a pressing need to show investors "success" at the Columbus facility, Defendants repeatedly misled investors about the status of operations at the Columbus facility.

**A.      Misleading Statements During the Fourth Quarter of 2012**

53.      On November 8, 2012, KiOR issued a press release announcing its third quarter results ended September 30, 2012.  The Defendants caused the Company to tout the commercial viability of KiOR's biofuel, reporting to investors in its press release that:

> "I am pleased to announce that we have commenced operations at the Columbus facility and have produced high quality oil that is in line with our specifications for upgrading into cellulosic gasoline and diesel," said Fred Cannon, KiOR's President and Chief Executive Officer. "More importantly, we believe the high quality of the oil from the Columbus facility validates KiOR's proprietary biomass fluid catalytic cracking, or BFCC technology at commercial scale. ***The facility's performance to date not only meets our expectations based on our experience at our pilot and demonstration scale facilities, but also gives me confidence that we remain on track to upgrade our oil in order to ship America's first truly sustainable cellulosic gasoline and diesel for American vehicles.***"

[Emphasis added.]

20

54. The same day, the Company held an earnings call to update investors regarding KiOR's progress towards producing commercially viable quantities of its biofuel. On this earnings call, Cannon lauded KiOR's progress towards producing biofuel in commercially viable quantities, stating in relevant part:

> Today, I want to update you on our successful start-up of our Columbus facility, and discuss our progress on the R&D front. Starting first with Columbus. *Recall on our last earnings call in August, I said, we planned to commence start-up operations at the facility in September and to make our first commercial shipments during the October, November timeframe. In this regard, I'm pleased to report, that we started production at the Columbus facility in October.* Our proprietary technology is operating as operating as designed at commercial scale and producing high quality renewable crude oil, conforming to our design specs. *We have also been building our oil inventory and anticipating, commencing, upgrading operations in the next week or so.*
>
> *All of this gives me confidence, that we will ship the world's first cellulosic gasoline and diesel fuel products on schedule later this month.* I will give you a bit more color on the facility start-up and performance, but first, I want to take stock of what we have accomplished getting to this point and what the advent of production at Columbus facility means for the U.S. generally, and the renewable fuel sectors specifically.

[Emphasis added.]

55. The foregoing statements were false and materially misleading because the Columbus facility was not, as Cannon proclaimed, "operating as designed at commercial scale."

█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████ Defendants determined to bury the many problems at the Columbus facility because ███████████████████████████████████
████████████████████████████████████████████████████████ The Columbus facility's success was ██████████████████████ – Defendants were not willing to jeopardize that – even at the expense of KiOR's investors or compliance with federal

securities laws.

**B.      Misleading Statements During the First Quarter of 2013**

56.      During an earnings call on March 18, 2013, Defendants caused the Company to

continue its misinformation campaign. They misleadingly informed its investors regarding the

commercial viability of the Columbus facility's operations. Cannon stated in relevant part:

> Since our last update in November, we have made substantial progress in
> addressing all three of these risks. *Yesterday, our Columbus facility made the
> world's first commercial shipment of cellulosic diesel fuel, the most important
> step in answering the remaining questions surrounding our scale-up risk. With
> this shipment, we have now operated our proprietary biomass-to-fuel to
> platform from beginning to end at commercial scale with the final hydrocarbon
> products, gasoline and diesel, produced by our facility on specification and
> ready to drop into American cars and trucks.* The mitigation of scale-up risk due
> to commercial production of cellulosic gasoline and diesel at Columbus is a
> remarkable achievement by the KiOR team.
>
> In four years, we have successfully achieved a 20,000 ton scale-up in our
> proprietary biomass-to-fuels technology, from proof of concept in our pilot plant
> to our demonstration plant and now to our first commercial-scale facility at
> Columbus. *In less than two years after breaking ground in Columbus, we have
> constructed, commissioned, and operated our technology on a commercial
> scale.* Quality of the world's first commercially produced cellulosic gasoline and
> diesel has exceeded our expectations, and I couldn't be more proud of the KiOR
> team for this accomplishment.
>
> I do recognize, however, that many of you were expecting us to commence
> commercial shipments late last year, consistent with our guidance from our last
> earnings call. Did we set an aggressive target for ourselves? Yes. Am I
> disappointed that we missed our target? Absolutely, yes. Did we encounter
> unexpected start-up issues unrelated to our technology? Yes, we did. *However, we
> have overcome these normal start-up issues, and we have proven that KiOR's
> proprietary biomass-to-fuels technology works at commercial scale at
> Columbus.*
>
> \*          \*          \*
>
> Now our focus at Columbus turns toward achieving steady-state operations. Until
> now, we have the facility fully lined – until we have the facility lined out, which
> we believe could take at least nine months, any guidance that we might give to the
> basic metrics of plant performance that we used in petrochemicals will have to
> have an unusually wide error bar around them. Given what I just said about the

fact that production volumes in the first quarter will be negligible, looking at the remaining nine months of the year, *we believe our volume expectations to be approximately 3 million to 5 million gallons for the balance of the year*. We have learned a lot at Columbus over the last several months, and we believe we can apply the leanings from Columbus to the engineering and design of Natchez.

[Emphasis added.]

57.    Again, Cannon falsely told investors that any problems experienced by the Columbus facility were "normal start-up problems" that had already been "overcome" and that KiOR was on track to create "3 million to 5 million gallons" of fuel at the Columbus facility for 2013.



58.    Moreover, even when the Columbus facility was operational,



**C.    Misleading Statements During the Second Quarter of 2013**

59.    During an earnings call on May 9, 2013, Cannon continued to mislead investors regarding the commercial viability of its production of biofuel, estimating "300,000 to 500,000"

23

gallons of total fuel production for the second quarter. Cannon stated in relevant part:

> "First, let me take this opportunity to tell you what's going on at Columbus facility. As you know, we produced and shipped the world's first commercial volume of cellulosic diesel during the first quarter. Our core technology continues to perform at or above our expectations. ***We are pleased with the progress of the startup of the facility and it is consistent with both our experience and our guidance from last quarter.*** Most importantly, the facility is running. As we expected, we are beginning to see everything coming together. The operational data from last quarter bears this out.
>
> During the first quarter, the conversion unit of the Columbus facility, which contains KiOR's proprietary BFCC technology, operated for a total of 441 hours, representing an on-stream percentage of approximately 20%. This represents an improvement of approximately 500% from the on-stream percentage during the previous quarter. Through these start-ups and runtimes, out BFCC technology has consistently performed.
>
> In general, each run at the facility is longer than the previous one. And we are seeing these longer runs without any compromise in the high quality of the oil that the facility produces. There are the types of trends that we'd like to see. We want our runtimes to be longer and our downtimes to be shorter.
>
> ***
>
> ***Looking now to our expectations for production in the second quarter, we are poised to build on positive momentum in the first quarter.*** We have already had a production run at the converter in April that nearly matched our average performance during the first quarter. We expect our on-stream percentage and our average production run to increase on a quarter-over-quarter basis from the first quarter.
>
> ***
>
> ***Consistent with our previous guidance, we expect that total fuel production during the second quarter will range between 300,000 gallons and 500,000 gallons, keeping us on track to fall within our projected production range of 3 million gallon[s] to 5 million gallons for 2013.*** With the gasoline pathway now approved by EPA and effective, we can produce, ship and sell both our cellulosic gasoline and diesel with a clear path to market under RFS2. Now having proven our technology, produced high-quality oil and upgraded to consistently high-quality diesel and gasoline, we are on our way to filling up more vehicles in America with cellulosic fuel made from non-food sources and offering a significantly less environmental footprint when compared to conventional fuels, and this from a company which just came into existence in late 2007.

[Emphasis added.]

24

60.     During the same press call, Karnes reiterated Cannon's representations that KiOR would produce three to five million gallons of fuel in 2013 and would generate 300,000 to 500,000 gallons of fuel in the second quarter of 2013.

61.     The assertion by Cannon and Karnes that the Columbus facility was "on track" to produce between 300,000 and 500,000 gallons of fuel for 2Q 2013 and three to five million gallons of fuel for 2013 as a whole lacked any reasonable basis, was false and deeply misleading. KiOR's second quarter comprised the months of April, May, and June.



Because Defendants understood that funding was contingent on the Columbus facility's perceived success, they stood idle as Cannon and Karnes made material misstatements regarding the production capacities and success of operations at the Columbus facility *every quarter through the Relevant Period*.

**D.     The Truth Is Revealed**

62.     On August 8, 2013, the Company disclosed to investors that it had only shipped 75,000 gallons of cellulosic fuel during the second quarter of 2013 – far below the 300,000-500,000 gallons Cannon had promised to investors only three months before. In a press release, the Company stated:

25

"In total," Cannon continued, "we shipped over 75,000 gallons of cellulosic fuel from Columbus. The BFCC unit is running now and producing high quality oil that we are preparing to upgrade into fuel and ship to our customers. Over the next few months, we will focus on further building that progress and we look to push the facility closer to its nameplate capacity."

63.     As a result of this disclosure, KiOR stock declined $2.14 per share, or over 44%, over the course of the next six trading sessions, from a close of $4.76 per share on August 7, 2013 to a close of $2.62 per share on August 15, 2013.

## DAMAGES ALLEGATIONS

64.     As a direct and proximate result of the Defendants' wrongdoing, KiOR has suffered, and will continue to suffer, a myriad of damages.

65.     The Defendants' actions have caused KiOR to suffer reputational damages.  For example, an August 21, 2013 article by RenewableEnergyWorld.com indicated that CEO Cannon's lack of candor regarding the reasons for KiOR's inability to make its second quarter targets has caused concern among investors.[20]  These credibility issues impede KiOR's ability to reach out to investors and obtain additional financing by pointing to the actual progress at the Columbus facility.

66.     KiOR is currently the subject of a securities fraud class action alleging that KiOR, Cannon, and Karnes violated sections of the Securities Exchange Act of 1934 by knowingly and recklessly misleading investors concerning KiOR's business operations.  This class action is styled *Berry v. KiOR, Inc.*, No. 13-cv-2443 (S. D. Tex. 2013) and will cause KiOR to incur defense costs and exposes KiOR to a substantial adverse judgment.

67.     Further, Cannon and Karnes have engaged in insider trading in the amount of $580,000, and these ill-gotten gains properly belong to the Company.

---

[20]   Kathryn Morrison, *What's Eating KiOR?*, RENEWABLE ENERGY WORLD, Aug. 21, 2013, http://www.renewableenergyworld.com/rea/blog/post/print/2013/08/whats-eating-KiOR.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

68.     Demand on KiOR's current Board of Directors to assert the claims detailed in this Complaint on behalf of KiOR would be futile because five of the seven members of KiOR's Board of Directors – a majority – were complicit in the wrongdoing complained of herein

69.     During the Relevant Period, Defendants were repeatedly informed about production issues at the Columbus facility.  All Defendants regularly attended Board meetings during the Relevant Period and were apprised of the setbacks and limited production capacity at the Columbus facility.  Despite their knowledge, the Defendants consciously allowed Defendants Cannon and Karnes to make misstatements to the public regarding the Columbus facility's production capabilities and success of operations.  For these reasons, Defendants now face a substantial risk of liability for their actions that renders them incapable of considering a demand in a disinterested manner.  Accordingly, there is a clear need for Plaintiff to assert the claims herein and rectify Defendants' wrongdoing, and any demand would be futile.

70.     Plaintiff was a shareholder at the time of the conduct complained of herein and has continuously held shares of KiOR to the present.  Plaintiff will continue to be a shareholder of KiOR throughout the pendency of this action.  Plaintiff will adequately and fairly represent the interests of KiOR and its investors in enforcing its rights.  Plaintiff has not made a demand on the Board to institute this action, based upon the review of §220 books and records and publicly available information, because such a demand would be futile.

71.     Demand on KiOR Board is futile because the decision by KiOR's Board of Directors to knowingly permit management to make material misstatements regarding KiOR's Columbus facility's production capabilities and overall financial health over the course of a year, in violation of the federal securities laws, was not a valid exercise of business judgment.  Five

members of KiOR's seven-member Board of Directors, Cannon, Kaul, Paterson, Roach, and Whitlock, sat on the KiOR Board during the Relevant Period, during which they were regularly informed, in detail, about the Columbus facility's constant shutdowns and set-backs, yet these five defendants consciously allowed Cannon to materially misstate the Columbus facility's production capabilities *every quarter* through the Relevant Period.

72.     Each KiOR Board member named is incapable of independently and disinterestedly considering demand to commence and vigorously prosecute this action.

   a.   Defendant Cannon is incapable of considering demand because:

      i.   He is named in the securities fraud class action, *Berry v. KiOR, Inc.*;

      ii.  He is the architect of the fraud by making repeated false and misleading statements to investors, as detailed in this Complaint;

      iii. He was the CEO throughout the Relevant Period, attended all Board meetings during the Relevant Period, and actively participated in the wrongdoing alleged;

      iv.  He faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein;

      v.   As the Company readily admits, he is not "independent" under its own standards or the standards of NASDAQ because of his financial entanglements with the Company; and

      vi.  He received total compensation in excess of $4 million in 2012, to which he was not entitled and would be required to return to KiOR.

   b.   Defendant Kaul is incapable of considering demand because:

      i.   He is a general partner at Khosla Ventures. Through Khosla Ventures, Kaul has remained a major equity investor through the Relevant Period;

      ii.  He participated or consciously tolerated the material misstatements made on behalf of KiOR. Kaul has been a Director of KiOR since the Company's inception in 2007 and has participated in all Board meetings during the Relevant Period;

iii. As the Company readily admits, he is not "independent" under its own standards or the standards of NASDAQ because of his professional and financial entanglements with the Company; and

iv. He faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein.

c. Defendant Whitlock is incapable of considering demand because:

i. He participated or consciously tolerated the material misstatements made on behalf of KiOR. Whitlock has been a Director of KiOR since 2010, became Lead Director in 2013, and has participated in all Board meetings during the Relevant Period; and

ii. He faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein.

d. Defendant Roach is incapable of considering demand because:

i. He participated or consciously tolerated the material misstatements made on behalf of KiOR. Roach has been a Director of KiOR since 2010 and has participated in all Board meetings during the Relevant Period;

ii. He faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein; and

iii. He is a member of the Audit Committee, and must monitor "the integrity of the Company's financial statements." Moreover, as pled in the Complaint, Roach attended numerous meetings where he learned of the Columbus facility's operational issues, yet allowed Cannon's misstatements to continue through the Relevant Period.

e. Defendant Paterson is incapable of considering demand because:

i. He participated or consciously tolerated the material misstatements made on behalf of KiOR. Paterson has been a Director of KiOR since June 2012 and has participated in all but one Board meeting during the Relevant Period; and

ii. He faces a substantial likelihood of liability for breach of fiduciary duty claims asserted herein.

29

## FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

*(Breach of Fiduciary Duty)*

73.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

74.     The Defendants each owe KiOR and its investors fiduciary duties of loyalty, good faith, and due care in managing the Company's affairs.

75.     As detailed above, the Defendants breached their fiduciary duties of loyalty and good faith by:

       a.  Failing to ensure that KiOR, its management, and directors complied with federal securities laws and KiOR's own code of conduct;

       b.  Failing to rectify the material misstatements made to investors on behalf of KiOR;

       c.  Disseminating and/or allowing the dissemination of false statements; and

       d.  Failing to prevent Cannon and Karnes from engaging in insider trading.

76.     As a direct and proximate result of the Defendants' breaches of their fiduciary duties, KiOR has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, the cost of defending KiOR against a securities class action.

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

*(Unjust Enrichment)*

77.     Plaintiff incorporates by reference and realleges each and every allegation contained in the preceding and subsequent paragraphs, as though fully set forth herein.

78.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense and detriment of KiOR.

79.     Plaintiff, as a shareholder and representative of KiOR, seeks restitution from

Defendants, and an Order of this Court disgorging all profits, benefits, board fees and other compensation obtained through wrongful breaches of fiduciary duties discussed herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.  Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.  Awarding, against all Defendants and in favor of KiOR, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.  Awarding to KiOR restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

D.  Directing KiOR to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with applicable laws, and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.  A clawback of compensation for Board members and executives who were involved in or approved the illegal activities detailed herein;

F.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 12, 2013    Respectfully submitted,


          */s/ Edward Jason Dennis*      
          Edward Jason Dennis
          Texas Bar No. 24045776
          Southern District Bar No. 68670
          Samuel B. Hardy, IV
          Texas Bar No. 24074360
          Southern District Bar No. 1514644
          LYNN TILLOTSON PINKER & COX, LLP
          2100 Ross Avenue, Suite 2700
          Dallas, Texas 75201
          Telephone: (214) 981-3800
          Facsimile: (214) 981-3839
          shardy@lynnllp.com
          jdennis@lynnllp.com

          *Local Counsel for Plaintiff*

          Thomas L. Laughlin IV
          (*pending admission pro hac vice*)
          SCOTT+SCOTT, Attorneys at Law, LLP
          The Chrysler Building
          405 Lexington Avenue, 40th Floor
          New York, New York 10174
          Telephone: (212) 223-6444
          Facsimile: (212) 223-6334
          tlaughlin@scott-scott.com

          Amber L. Eck
          ZELDES HAEGGQUIST & ECK, LLP
          625 Broadway, Suite 1000
          San Diego, California 92101
          Telephone: (619) 342-8000
          Facsimile: (619) 342-7878
          ambere@zhlaw.com

          *Attorneys for Plaintiff*

4846-8396-8279, v. 1

32

## VERIFICATION

I, Gary Gedig, hereby declare and verify that I am currently an owner of KiOR Inc. ("KiOR") stock and have continuously owned KiOR stock since October 11, 2012. I have read the allegations of the complaint and confirm that this action is not collusive and that I am capable and willing to fairly and adequately represent KiOR shareholders in enforcing the rights of the Company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _6_ day of December, 2013 at Whitefish Bay, Wisconsin.

_____
Gary Gedig